Darniece B. and Fred R. Epperson sued Liberty Homes, Inc. (hereinafter "Liberty"), seeking damages for breach of express and implied warranties and damages under the Magnuson-Moss Warranty-Federal Trade Commission Improvement Act, 15 U.S.C.A. §§ 2301-12, in connection with the sale of a new mobile home. After a trial, a jury awarded the Eppersons $194,174.70. The trial court denied Liberty's motion for j.n.o.v., new trial, or remittitur. Liberty appeals. We affirm.
During the summer of 1985, the Eppersons visited Harlan Trailer Sales, Inc., a Liberty mobile home dealer. John Harlan, owner of Harlan Trailer Sales, Inc., told the Eppersons that he sold only Liberty homes, and he recommended that they view certain mobile homes that were manufactured by Liberty that were on display in Leeds, Alabama. *Page 451 
The Eppersons returned to Harlan's office, which contained a Liberty plaque and brochures illustrating the types of homes Liberty manufactured. The Eppersons gave Harlan certain specifications for a custom-built Liberty double-wide mobile home, which was to have certain changes from a standard production model, including changing room sizes, adding a fireplace, changing the kitchen and bathroom arrangement, and adding a closet. Harlan assured the Eppersons that he would handle all arrangements for their special order.
On July 11, 1985, a Liberty salesman filled out an on-line production order for the Eppersons' home. Liberty knew the home was to be specially manufactured for the Eppersons, because the on-line production order identified the Eppersons as the customers. This production order was attached to a clip-board and travelled with the home as it went down the production line.
Once the home was manufactured, it was delivered in two separate sections to the Harlan Trailer Sales lot, where the Eppersons saw it for the first time. On July 25, 1987, the Eppersons signed an agreement to purchase the mobile home. The contract specified that the purchase price was $25,982.50, and it incorporated a security agreement. Long-term financing was provided by Green Tree Acceptance, Inc., and the monthly payments were $319.82.
Upon Harlan's recommendation, the Eppersons contacted Bruce Carswell who hooked up the electrical system to the mobile home. The Eppersons moved in on August 2, 1987.
While moving into the home, Mr. Epperson received an electrical shock when he leaned against the metal frame of a living room window, located on the front of the mobile home. Marie Griggs, a friend of the Eppersons who helped them move, was also shocked when she leaned on the front door frame. Bruce Carswell went to the Eppersons' home to investigate the problem and was shocked when he touched the front door handle.
Once Harlan was notified of the problem, he sent William Stockman, an employee of Alabama Electric Company, to correct it. Stockman hooked to the door and window frame a meter that measures voltage. The meter indicated that a 150-volt electric current was running through the frames. Believing that a "hot" wire was in contact with the frames and causing them to carry electrical current, Stockman replaced the wire with a "jumper wire" that rerouted the current away from the frames. Harlan paid Stockman for making the repairs and sent the bill to Liberty. In September 1985, the GFI receptacle (an electrical outlet) in the master bathroom broke. Harlan's workers replaced the receptacle.
Throughout the first year in their new home, the Eppersons noticed dimming of the lights. Mrs. Epperson stated that the power supply to the vacuum cleaner, toaster, and television would also fluctuate. Although the Eppersons notified Harlan about the power fluctuation, the problem was never remedied.
In February 1986, the home started to buckle in the center where the two sections of the home where joined. Harlan releveled the home in order to stop the buckling. Harlan was also called to repair a leak in the roof over the children's bedroom; however, the leak was never repaired to the Eppersons' satisfaction.
Because the power supply continued to be inconsistent, the Eppersons again contacted Harlan, who told them he would no longer help them because he believed their warranty had expired. When asked for a copy of the wiring diagram to their home, Harlan suggested that they call Mr. Steve Carroll of Liberty. According to the Eppersons, Mr. Carroll denied that any wiring diagram existed. Mr. Carroll denies ever having this telephone conversation with the Eppersons.
On the morning of January 13, 1988, Mrs. Epperson heard a "staticky radio sound" coming from the living room window area, and saw blue sparks shooting out from around the window. Mr. Epperson turned the power supply off and used his foot and a hammer to knock the plasterboard away. Behind the insulation he found melted, smouldering wires and *Page 452 
scorched insulation and 2 by 4's. Mr. Stockman came to the home and cut the burned wires and installed a temporary system so that the plugs and lights would work.
Mr. Epperson alleges that Harlan denied responsibility based upon his belief that the warranty had expired. Epperson also alleges that Mr. Steve Carroll of Liberty promised he would send someone to the Eppersons' home to make repairs. No Liberty representative came. Harlan and Carroll deny having any conversation with the Eppersons.
Carroll finally sent Mr. Gary Chancey to the Eppersons in response to a letter by Mrs. Epperson concerning the sparks and the scorched wall materials. Chancey claimed he was not qualified to make the wiring repairs and suggested that Epperson get the same person who had made the temporary repairs to make permanent wiring changes, and he said it would be done at Liberty's expense. Epperson took Chancey's advice and got Stockman to make the repairs, with Liberty's knowledge.
During the summer of 1988, the power supply in the kitchen began fluctuating, and in September the entire rear half of the home lost power. A-1 City Electric Company fixed the problem temporarily. The Eppersons again contacted Liberty in order to get a wiring diagram for their home, but they never received a response.
In October 1988, the Eppersons' attorney wrote Liberty, and Liberty sent Mr. Tommy Law, a repairman, to investigate the situation. According to the Eppersons, Mr. Law stated that their mobile home would have to be completely rewired and that they should find alternative housing while the repairs were being made. Shortly after Law's visit, the Eppersons rented and moved into a friend's single-wide mobile home. The Eppersons incurred the cost of hooking up utilities to their rental home, storing extra furniture, and paying rent. Living in the smaller home was an inconvenience, because the conditions were very cramped and there was a lack of privacy.
In addition to the cramped living conditions, Mrs. Epperson worried about the possibility that the home could catch fire and worried that if it did she might not be able to get her children out of the home. The Eppersons installed battery-powered smoke detectors and conducted family fire drills.
Having made 37 payments on their home to Green Tree Acceptance, Inc., the Eppersons ceased making payments. Their double-wide home was repossessed, and Green Tree sued the Eppersons for the balance of their loan. The Eppersons reached a settlement with Green Tree.
On November 18, 1988, the Eppersons sued Liberty, alleging breach of contract, breach of express and implied warranties, and fraud. At the close of the evidence, the Eppersons amended their complaint to allege implied fraud and to seek damages under the Magnuson-Moss Warranty Act.
I. Fraud
Liberty argues that the trial court erred when it allowed the Eppersons to amend to add their fraud claim so as to make the pleadings conform to the evidence. Amendments to a complaint should be liberally allowed; A.R.Civ.P. 15(b). Amendments to a complaint will be disallowed only when prejudice to the other party results. McElrath v. Consolidated Pipe Supply Co.,351 So.2d 560 (Ala. 1977). In the present case, fraud was alleged in the original complaint. Liberty could not have been prejudiced by the amendment, which merely restated the claim based upon the facts originally alleged. Thus, the trial court did not err in allowing the amendment. Bracy v. SippialElectric Co., 379 So.2d 582 (Ala. 1980).
Liberty argues that damages for mental anguish can not be awarded on a claim for relief is based upon fraud. It is not necessary to address that contention, however, because the Eppersons were entitled to receive damages for mental anguish based upon their breach of contract claim. B M Homes, Inc. v.Hogan, 376 So.2d 667 (Ala. 1979). *Page 453 
II. Warranty A. Express Warranty
Liberty also argues that the limitation of warranty included in the Eppersons' "Home Owners Manual" precludes any liability for defective parts or damaged property after the period specified. When a jury finds that the limited warranty has failed of its essential purpose, it may then award damages allowed by the Uniform Commercial Code (Ala. Code 1975, Title 7). Belcher v. Versatile Farm Equip. Co., 443 So.2d 912 (Ala. 1983). Because the essential purpose of the warranty was to provide the Eppersons with a home reasonably free from defects, and there was evidence to show that this purpose was never achieved, Liberty's warranty may be deemed a failure. SeeLiberty Truck Sales, Inc. v. Kimbrel, 548 So.2d 1379 (Ala. 1989); Peterbilt Motors Co. v. Martin, 521 So.2d 946 (Ala. 1988). The Eppersons may recover under an express warranty theory, and Liberty's limitation does not prevent recovery.
Liberty also argues that the Eppersons should not be allowed recovery under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301
et seq. We disagree. The Magnuson-Moss Warranty Act, providing recovery for damages as to consumer goods, does apply to mobile homes. Brigadier Homes, Inc. v. Thompson, 551 So.2d 1031 (Ala. 1989). The Act states that once the manufacturer of consumer goods makes efforts to repair the goods or to meet certain specifications, the purpose of the repair or efforts becomes part of the original bargain between the parties. The Act also allows for attorney fees required in order to enforce the provisions of the Act.
The evidence indicates that Liberty made several efforts to repair the electrical system in the Eppersons' home. The purpose of Liberty's actions was to provide the Eppersons with a home reasonably free from electrical defects. The Eppersons had the right under the Magnuson-Moss Warranty Act to sue for Liberty's failure to properly repair the electrical system in their home. The award of attorney fees required to enforce the Act was proper.
 B. Implied Warranty
Liberty asserts that, because there was no privity between Liberty and the Eppersons, the Eppersons could not recover under an implied warranty theory of liability. Section 7-2-318, Code of Alabama (1975), states in pertinent part:
 "A sellers' warranty, whether express or implied, extends to any natural person if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by the breach of the warranty."
Because the purchase order bore the name of the Eppersons and their home was custom built for them by Liberty, there was sufficient evidence for the jury to conclude that Liberty reasonably expected the Eppersons to be affected by any problems with the home. Under this section, the jury could conclude that Liberty was liable.
III. Contract
Liberty argues that it should have no liability to the Eppersons because, it says, there was no contract between them. A manufacturer, such as Liberty, may be held liable in contract if the dealer with which the plaintiff contracted was an agent for the manufacturer. Massey-Ferguson, Inc. v. Laird,432 So.2d 1259 (Ala. 1983). Both Fred and Darniece Epperson testified that Harlan's office was located in a Liberty mobile home and that it contained brochures and pamphlets. Mr. Epperson testified that he saw a Liberty plaque and he said that Harlan indicated to him "that he sold nothing other than for a new manufacturer, Liberty, and other than that he sold nothing but used mobile homes." Harlan also recommended that the Eppersons purchase a Liberty home. Using these facts, the jury could have concluded that Harlan was Liberty's agent and, thus, that Liberty was liable to the Eppersons based upon their contract with Harlan.
Liberty argues that the trial court erred when it denied Liberty's motion for directed verdict, j.n.o.v., or new trial. Liberty claims that the Eppersons could *Page 454 
not receive damages for mental anguish in a breach of contract claim. In general, damages recoverable for a breach of contract do not include damages for mental anguish. Sanford v. WesternLife Insurance Co., 368 So.2d 260 (Ala. 1979). Damages for mental anguish can be recovered, however, "where the contractual duty or obligation is so coupled with matters of mental concern or solicitude, or with the feelings of the party to whom the duty is owed, that a breach of that duty will necessarily or reasonably result in mental anguish or suffering." B M Homes, Inc. v. Hogan, 376 So.2d 667, 671
(Ala. 1979) (quoting earlier cases).
In Alabama Power Co. v. Harmon, 483 So.2d 386 (Ala. 1986), Alabama Power Company failed to provide Harmon with electrical service as it had promised to do. Harmon's mobile home was rendered uninhabitable because of the company's failure to supply electricity. There was evidence that Harmon had to rely upon his friends and upon other family members to provide housing and that this fact caused him to suffer emotional distress. Based upon these facts, this Court upheld the award of damages for mental distress.
In the present case, the Eppersons contracted with Harlan to purchase a home specially manufactured by Liberty. Understood in this contract was the belief that the home would be constructed to carry electrical current safely. The plaintiffs' evidence indicated that it was not so constructed; therefore, the jury could find a breach of contract. There was evidence that the Eppersons suffered mental anguish as a result of the electrical problems with their home, and the evidence, therefore, supported the jury's verdict. Therefore, the trial court did not err in denying a directed verdict, in refusing to set the verdict aside, or in denying a new trial.
Liberty also alleges that the trial court erred in denying its motion for j.n.o.v or new trial because one juror failed to respond correctly to the question whether anyone was presently a plaintiff in a lawsuit. The trial judge has the discretion to decide whether the juror's failure to respond correctly was prejudicial to Liberty. Ensor v. Wilson, 519 So.2d 1244 (Ala. 1987), rehearing denied, 537 So.2d 66 (Ala. 1988).
 "There is no question but that in this jurisdiction a jury verdict carries with it a presumption of correctness and when, as here, the trial court refuses to grant a motion for a new trial, that presumption is strengthened. Westbrook v. Gibbs, 285 Ala. 223, 231 So.2d 97; T.R. Miller Mill Co. v. Ralls, 280 Ala. 253, 192 So.2d 706; Robbins v. Voigt, 280 Ala. 207, 191 So.2d 212."
Gleichert v. Stephens, 291 Ala. 347, 349, 280 So.2d 776, 777
(1973).
AFFIRMED.
HORNSBY, C.J., and MADDOX, HOUSTON and KENNEDY, JJ., concur.