THOMAS, Judge.
 

 Charles L. “Chuck” Baldwin and Sylvia K. “Katie” Kelly, a husband and wife doing business as Baldwin Construction Company (“the builders”), appeal from a judgment in favor of Michael Panetta and Sharon Panetta (“the owners”). We affirm in part, reverse in part, and remand the cause with instructions.
 

 The builders sued the owners, alleging breach of a construction contract and seeking to enforce a lien on the owners’ property pursuant to § 35-11-210, Ala.Code 1975. The owners answered and counterclaimed, alleging breach of contract, negligence, fraud, breach of fiduciary duty, and money paid not owed. Following a two-day bench trial, the circuit court entered a judgment on February 23, 2007, in favor of the owners on the builders’ breach-of-contract claim and on the owners’ breach-of-contract and fraud counterclaims.
 
 [1]
 
 The court assessed the owners’ compensatory damages at $57,200.17 and determined that the builders were entitled
 
 *558
 
 to a setoff of $5,530 against that amount, for a net judgment in favor of the owners in the amount of $51,670.17.
 

 The builders filed a postjudgment motion on March 21, 2007. On March 28, 2007, the circuit court signed an order purporting to grant that motion. The order states that the motion had come “to be heard,” but the date for the hearing was left blank and no hearing was ever held.
 
 [2]
 
 The next day, the court signed an “Order Setting a Hearing” on the motion for April 18, 2007. On June 14, 2007, the court reset the hearing for June 26, 2007. However, the 90th day following the filing of the builders’ March 21, 2007, postjudgment motion was June 19, 2007, and the motion was denied by operation of law on that day pursuant to Rule 59.1, Ala. R. Civ. P. The builders appealed to the Alabama Supreme Court on July 24, 2007, well within 42 days of June 19, 2007, as permitted by Rule 4(a)(3), Ala. R.App. P. The supreme court transferred the appeal to this court pursuant to § 12-2-7(6), Ala.Code 1975.
 

 Factual Background
 

 In July 2002, the owners, whose primary residence is in Alpharetta, Georgia, bought a lot on Lewis Smith Lake in Winston County, Alabama. The owners decided to construct a house on the lot according to plans and blueprints developed by Linwood Homes, a Canadian company whose model home the owners had seen and admired in South Carolina. An officer of Linwood Homes referred the owners to the builders, and, in December 2002, the owners wired $10,000 to the builders’ business bank account in order to enable the builders to begin preliminary work on house. On January 11, 2003, the owners signed a contract with the builders to construct a 5,000-square-foot, 6-bedroom, 5-bath lake house.
 

 The contract provided that the owners would provide the construction materials as shown on the house plans; that they would pay the builders $56,000 as compensation for their services as the general contractor for the project; and that they would pay the builders $106,660 for their services as the subcontractor for framing, carpentry, and finish work. The contract set out the following draw schedule for the general-contractor payments:
 

 30% at contract signing $16,800
 

 15% at 90 days from the start of framing 8,400
 

 15% at 120 days from start of framing 8,400
 

 40% at project completion 22,400
 

 The contract further provided:
 

 “All materials shall be new and both materials and workmanship shall be first class and good quality. In the event of any discrepancy between the description of materials and specifications and said drawings, the description of materials and specifications provided by Owners shall prevail over said drawings.
 

 [[Image here]]
 

 “The Contractor recognizes the relation of trust and confidence established between him and the Owners by the agreement. He covenants with the Owners to furnish his best skill and judgment and to cooperate with the owners in forwarding the best interest of the Owner. He agrees to secure the execution and completion of the improvements required by this agreement in the best and soundest way and in the most expeditious and economical manner consistent with such interest of the Owners.
 

 “The Owners, without invalidating this agreement, may order extra work or
 
 *559
 
 make changes in the improvements required by this agreement by altering, adding to or deducting from such improvements by notifying the Contractor.”
 

 Problems developed early in the construction project. The builders presented evidence indicating that many of the problems were caused by delays incident to the owners’ numerous change orders and the owners’ interference with the work of the subcontractors. The owners presented evidence indicating that the most of the problems were caused by what, they said, was substandard workmanship by various subcontractors, which they attributed to the builders’ failure to supervise and inspect the subcontractors’ work.
 

 The owners presented testimony that the bathroom showers leaked, a problem that they traced to a subcontractor’s improper installation of the shower pans. The owners notified the builders of their dissatisfaction with the subcontractor’s work, and the parties agreed that the builder would replace, at no cost to the owners, the shower pans in all five of the bathrooms — a process that required the removal of the concrete and the defectively installed shower pans from the shower floors, the installation of new shower pans, and then the repourihg of the concrete. After discussing the issue with the owners, the builders hired a new subcontractor to replace the shower pans and represented to the owners that five shower pans had been replaced at no cost to them.
 

 The owners later learned from the new subcontractor, however, that he had replaced only three of the five shower pans. In addition, the owners were charged $3,500 by the builders for the cost of replacing the shower pans, despite the builders’ agreement to absorb the replacement expense. At trial, Chuck Baldwin testified that, although he had originally agreed to replace the shower pans at no cost to the owners, he had “changed his mind.”
 

 The owners presented evidence indicating that the builders had failed to supervise and inspect the work of the granite subcontractor and the hardwood-flooring subcontractor; accordingly, the owners said, the work of those subcontractors was substandard and the builders had wrongfully paid them. The owners presented photographs of a granite countertop with a large crack. The subcontractor, a granite fabricator and installer, testified that the photographs depicted a fissure in a granite slab that, he said, represented an “unfinished job.” The subcontractor stated that he had been planning to finish the job by joining, bonding, and buffing the granite to repair the fissure, but, he said, before he could return to complete the work, the builders informed him that they had been instructed by the owners not to return to the job site without written authorization.
 

 The owners presented evidence indicating that the hardwood flooring had been improperly installed with finishing nails, which were not recommended by the Wood Flooring Manufacturers’ Association, thereby voiding the warranty on the floor. The flooring subcontractor disputed the owners’ evidence, stating that he had been in the hardwood-flooring business since 1978 and had always used finishing nails to attach the flooring to the joists. The owners hired another flooring contractor to repair the floor, but that contractor refused to work on the existing floor when he discovered how it had been installed. He recommended that the flooring be removed and replaced. Ultimately, the owners decided to replace the hardwood floor with slate tiles.
 

 The owners were dissatisfied with the paint color of the front door, and the builders repainted it twice. The owners were also displeased that the stain color on the
 
 *560
 
 natural-wood surfaces in the house — the ceiling, doors, windows, cabinets, and trim — was not uniform and did not match the color they had chosen. The builders presented evidence indicating that the col- or differences were due to the lighting in the house and to the fact that different types of wood naturally absorb stain differently.
 

 The testimony was in conflict with respect to whether the builders had agreed to get three bids for all subcontracted work before deciding on a subcontractor to perform the work. The owners presented evidence, which was disputed by the builders, indicating that the builders had solicited “fake bids” to satisfy the three-bid requirement.
 

 During the construction of the lake house, the builders lived in a trailer on the construction site and regularly communicated with the owners in Georgia by e-mail messages. The record contains dozens of e-mails that the parties exchanged between January and October 2003. On October 27, 2003, Michael Panetta sent the builders an e-mail message with the subject line “Nearing Completion.” The message states:
 

 “Sharon and I do not want this project to end on a sour note and rest assured we are as interested as you in seeing it completed as soon as possible. As I noted in my last e-mail to you, we are excited to see how close we are to finishing and expect we will love it once completed.
 

 “To that end I would like to request a list of all the subcontractors used to date, including addresses and phone numbers, along with a lien waiver or other document which is satisfactory to me, indicating that they have been paid in full for the labor and supplies provided. In those instances where final payment has not been made I would appreciate a list where partial payment has been made with the remaining balances. I would like to receive this prior to any future requests for any other payment (normally each Wednesday). If this cannot be provided by this Wednesday, October 29th, I will accept in the interim a partial lien waiver from you listing all subcontractors used to date that have been paid in full and a list where partial payment has been made with the remaining balances.
 

 “Considering there is not much more regarding invoices to finishing things up, I would prefer the remaining payments be handled in a manner that will require the subcontractor to provide a lien waiver as we provide final payment. Therefore, I will overnight payments beginning this week made jointly payable to you and the subcontractor and would appreciate your assistance in securing all remaining waivers. Please ensure I have the proper business name for you and each subcontractor and the mailing address you want to receive it at.
 

 “As previously discussed
 
 I must ask that no work or work changes be done without my mitten consent
 
 Rest assured I have enough money to pay for the completion of the project.
 

 “Your prompt attention to this would be greatly appreciated.”
 

 (Emphasis added.)
 

 The builders testified that they considered the owners’ October 27, 2003, e-mail message as an order to leave the site and to halt any further work on the project. The builders discontinued work on the project, filed a lien against the owners’ property on October 29, 2003, and filed suit against the owners on November 19, 2003. At the time the builders abandoned the project, the owners had not paid the builders’ final general-contractor draw.
 

 
 *561
 
 The owners testified that they did not intend the builders to stop work on the construction project, but only to secure their express approval before undertaking further work. The owners presented evidence indicating that in later e-mail messages on November 5, November 6, November 8, and November 17, 2003, they had inquired about the progress of the construction project and had assumed that the builders were still on the job and working. Katie Kelly acknowledged that she had continued to communicate with the owners about the project after having received the October 27 e-mail message.
 

 On appeal, the builders present four issues: that the evidence did not support the circuit court’s judgment on (1) the builders’ breaeh-of-contract claim, (2) the owners’ breaeh-of-contract counterclaim, and (3) the owners’ fraud counterclaim, and that (4) the compensatory-damages award to the owners was excessive.
 

 Standard of Review
 

 The circuit court entered a judgment in favor of the owners on the builders’ breach-of-contract claim and on the owners’ breach-of-contract and fraud counterclaims. Although the judgment contains no express findings of fact, we “will assume that the trial judge made those findings necessary to support the judgment.”
 
 Transamerica Commercial Fin. Corp. v. AmSouth Bank, N.A.,
 
 608 So.2d 375, 378 (Ala.1992). Under the ore tenus standard of review, both “the trial court’s judgment and all implicit findings necessary to support it carry a presumption of correctness and will not be reversed unless ‘found to be plainly and palpably wrong.’ ”
 
 Transamerica,
 
 608 So.2d at 378
 
 (quoting Fitzner Pontiac-Buick-Cadillac, Inc. v. Perkins &
 
 Assocs.
 
 Inc.,
 
 578 So.2d 1061, 1063 (Ala. 1991)). We deduce that the circuit court must have determined that the builders failed to prove at least one element of their breach-of-contract claim against the owners, and, correspondingly, that the owners succeeded in proving all the elements of their breach-of-contract and fraud counterclaims against the builders. We will review those determinations to evaluate whether they were “plainly and palpably wrong.”
 

 I.
 
 The Builders’ BreacSv-of-Co?itract Claim
 

 To prevail on a breach-of-contract claim, a plaintiff is required to prove “(1) the existence of a valid contract binding the parties in the action, (2) [the plaintiff’s] own performance under that contract, (3) the defendant’s nonperformance, and (4) damages.”
 
 Southern Med. Health Sys., Inc. v. Vaughn,
 
 669 So.2d 98, 99 (Ala.1995). The builders argue that the owners’ October 27, 2003, e-mail message amounted to a stop-work order that prevented the builders from rendering full performance under the contract. The builders contend that they presented substantial evidence indicating that they would have completed their bargained-for performance under the contract but for the owners’ directive to discontinue work on the construction project.
 

 A defendant breaches a contract when he or she prevents performance of the contract without the fault of the plaintiff whose duty it was to perform and who is ready, willing, and able to perform.
 
 See Braswell v. Malone,
 
 262 Ala. 323, 328, 78 So.2d 631, 636 (1955) (stating that when ‘“full performance by [a] builder is excused by reason of the wrongful acts of the owner, the builder may sue on the contract to recover for the work done according to the contract and for the loss, in profits or otherwise, sustained; or he may treat the contract as rescinded and sue on a quantum meruit to recover the full value of the labor done and the materials furnished in
 
 *562
 
 the partial performance of the contract, even though this may exceed the contract price’ ” (quoting 17 C.J.S.
 
 Contracts
 
 § 367 at 833-84)). “A party to a contract who has caused a failure of performance by the other party cannot take advantage of that failure.”
 
 Big Thicket Broad. Co. of Alabama, Inc. v. Santos,
 
 594 So.2d 1241, 1244 (Ala.Civ.App.1991).
 

 It is well settled that once a party to a contract materially breaches the contract by repudiating the parties’ agreement, the other party is excused from performance and has an immediate cause of action for the breach.
 
 Federal Ins. Co. v. I. Kruger, Inc.,
 
 829 So.2d 732, 737 (Ala. 2002). In the present case, the circuit court was authorized to conclude that the owners’ October 27, 2003, e-mail message did not constitute a repudiation of the contract and did not excuse the builders’ further performance.
 

 In
 
 Ollinger & Bruce Dry Dock Co. v. James Gibbony & Co.,
 
 202 Ala. 516, 81 So. 18 (1918), the plaintiff contracted with the defendant to repair a barge. The barge was delivered to the defendant in June 1915; the defendant worked on the repairs during June, July, and August of 1915 and, intermittently, until December 1915. After December, however, the defendant performed no repair work on the barge. On June 23, 1916, the defendant sent the plaintiff a statement showing a claim for $4,000 of work done on the barge. On June 26, 1916, the plaintiff wrote the following letter to the defendant:
 

 “ ‘Please make no further repairs on our barge Cahaba, which is now at your docks, and which has been there now for almost one year and a half, and when you are ready to take up the repair work on this barge, please advise us as we desire to outline just what work is to be done.’ ”
 

 Ollinger,
 
 202 Ala. at 517, 81 So. at 19.
 

 On July 5, 1916, the barge was struck by a hurricane, resulting in its being declared a total loss. The plaintiff sued the defendant, claiming damages for the loss of the barge and for the loss of the use of the barge during the period in which the repairs were wrongfully delayed. The defendant insisted that the plaintiff could not recover damages for the delay in performance of the contract because the plaintiff, by its letter of June 26, 1916, had rescinded the contract.
 

 Rejecting the argument that the plaintiffs letter amounted to a rescission of the contract, the Alabama Supreme Court explained:
 

 “This letter is to be construed in the light of the facts and circumstances surrounding the parties at the time. Plaintiffs had been furnished a statement showing an amount for repair work at that time, which was very nearly double the sum which they considered was a reasonable compensation for the repairs, and, further, that plaintiffs knew at that time that the defendant ... had done no work whatever upon this job for practically seven months, and that no preparations were being made to resume work thereon. Plaintiffs were evidently not satisfied with the method by which their work was being handled, and
 
 we are of the opinion this letter is properly construed as merely a request that, when defendant undertakes to resume the repair on the barge, they be given notice so that they will have an opportunity to outline what should be done.
 
 The contract, as previously shown, was silent as to the exact repairs to be made upon the barge, and we have held that, in case of disagreement thereon, such repairs would be considered as consisting of
 
 *563
 
 what is the general and ordinary course pursued by reasonable and prudent business men in dealing with similar situations. Clearly it was within the rights of the parties to discuss among themselves as to what would be required to place the barge in good repair, and to make suggestions in reference thereto, and enter into discussions or negotiations as to what should be considered by the parties within the meaning of the words ‘good repair.’
 
 We therefore conclude that the letter is not to be construed as a rescission of the contract, but, on the other hand, that it appears on its face to show an express recognition of a continuance of the same, and expectation on the part of the plaintiffs that the repair work be resumed.”
 

 Ollinger,
 
 202 Ala. at 518, 81 So. at 20 (emphasis added).
 

 In the present case, the circuit court evidently construed the owners’ October 27, 2008, e-mail message “in the light of the facts and circumstances surrounding the parties at the time,”
 
 Ollinger,
 
 supra, and concluded that the message did not constitute a rescission of the contract. As in
 
 Ollinger,
 
 the owners’ communication to the builders expressly recognized that the parties had continuing obligations under the contract. The circuit court was authorized to find that, in light of previous disputes between the builders and the owners as to the payment of subcontractors, the owners’ October 27, 2003, e-mail message was a request that the builders cooperate in finalizing payments to the subcontractors in a manner that would protect the owners’ interest by having the subcontractors provide lien waivers.
 

 The builders’ entire breach-of-contract claim was based upon the premise that the owners’ October 27, 2003, e-mail message was tantamount to a repudiation of the contract that prevented the builders from performing thereunder. The circuit court obviously rejected that premise. Based on the authority of
 
 Ollinger,
 
 we hold that the circuit court’s decision on the builders’ breach-of-contract claim was not plainly and palpably wrong.
 

 II.
 
 The Owners’ Breach-of-Contract Counterclaim
 

 The circuit court’s implicit finding that the builders were not justified in treating the owners’ October 27, 2003, e-mail message as a stop-work order that was tantamount to a repudiation of the parties’ contract necessarily means that the builders’ abandonment of the project after October 27, 2003, constituted a breach of contract. The owners established their right to recover on the breach-of-contract counterclaim because, in addition to proving the builders’ breach, they also proved their own performance under the contract and damages. Accordingly, we affirm that part of the circuit court’s judgment in favor of the owners on their breach-of-contract counterclaim.
 

 III.
 
 The Owners' Fraud Counterclaim
 

 The owners’ evidence in support of their fraud counterclaim was derived from information they obtained after the litigation began. Specifically, the owners subpoenaed the builders’ bank records and learned, among other things, that from the owners’ $10,000 wire transfer to the builders’ bank account in December 2002, the builders had used $1,500 to pay for repairs on their 1938 Chevrolet wrecker truck. Although the parties’ understanding was that the $10,000 would be used for preliminary expenses incident to the construction project, such as land surveys and property-owners-review-eommittee fees, the evidence indicated that the builders sent the owners invoices of $250 for a “Stoney Point Landing Beview Committee fee” and $1,657.50 for a survey performed by C
 
 &
 
 C Surveying, Inc. At trial, Katie Kelly testi-
 
 *564
 
 fíed that the documents labeled “invoices” were merely statements accounting for how the builders had spent part of the owners’ initial $10,000 payment. Kelly acknowledged, however, that the documents did not explain that the expenses noted thereon had already been paid and did not negate the implication that the invoice demanded payment by the owners.
 

 Using the builders’ bank records, the owners also compared invoices they had received from the builders for subcontractors’ labor and supplies with the builders’ actual payment records to those subcontractors and suppliers. For example, the record shows that on August 27, 2003, the builders sent the owners an invoice requesting payment of $850 to Precision Concrete, a subcontractor, for work performed on August 22, 2003. Attached to the invoice was a handwritten statement indicating that on August 29, 2003, the builders had paid Precision Concrete $850 for concrete work. The builders’ canceled check to Precision Concrete, dated August 29, 2003, however, reflected that the builders had actually paid the subcontractor only $400 for its work.
 

 Similarly, the record reveals that on November 11, 2003, the builders submitted an invoice to the owners seeking payment of $3,000 for “removal of concrete for three showers” and reimbursement of $500 for rental of a jackhammer from Winfield Tool Company. The corresponding canceled check, however, reflected that the builders had paid Winfield Tool Company only $54.50 to rent the jackhammer. Chuck Baldwin explained that he had used the jackhammer to remove concrete in the showers as part of the shower-pan replacement insisted upon by the owners. He explained that his $500 invoice to the owners for “jackhammer rental” reflected not only the actual $54.50 rental fee, but also his time and mileage in driving round trip to Winfield Tool Company, a distance, he said, of 25 to 30 miles. Baldwin said that he had spent 8 hours removing the concrete and had charged the owners $100 per hour for his labor. When the owners’ attorney pointed out on cross-examination that Baldwin had charged the owners $3,000 instead of $800, Baldwin did not respond.
 

 The record reflects that the builders charged the owners $1,000 to “remove [a] wall by [the] stairs because of [the owners’] change order.” When questioned about that charge, Chuck Baldwin testified that it took him “a couple of hours probably” to remove the framing for the eight-foot wall. The owners’ attorney asked Baldwin whether he had charged $500 per hour for his labor in removing the wall framing, and Baldwin answered, “I guess I did.”
 

 Section 6-5-101, Ala.Code 1975, provides:
 

 “Misrepresentations of a material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite pai’ty, or if made by mistake and innocently and acted on by the opposite party, constitute legal fraud.”
 

 In
 
 George v. Associated Doctors Health & Life Insurance Co.,
 
 675 So.2d 860, 862 (Ala.1996), our supreme court explained the elements that must be proven to establish fraud:
 

 “Regardless of whether the representation is made willfully, recklessly, or mistakenly, a plaintiff alleging fraud must prove four elements: (1) a false representation; (2) that the false representation concerned a material existing fact; (3) that the plaintiff relied upon the false representation; and (4) that the plaintiff was damaged as a proximate result of the reliance.”
 

 
 *565
 
 The owners presented evidence indicating that the builders had submitted false and inflated invoices, that they had paid the invoices believing them to be valid, and that, as a result, they had been damaged. That evidence established a prima facie case of fraud.
 

 The builders do not dispute that the owners offered such evidence. Instead, they argue that “such evidence was rebutted by substantial evidence that the [builders] had properly charged for them materials and time, or had mistakenly charged on a few occasions for repeated items.” The builders’ argument implicitly acknowledges that there was a factual dispute as to whether some of their invoices were fraudulent. The circuit court resolved that factual dispute in favor of the owners, and we are not permitted to substitute our judgment for that of the circuit court. “The
 
 ore tenus
 
 rule is grounded upon the principle that when the trial court hears oral testimony it has an opportunity to evaluate the demeanor and credibility of witnesses.”
 
 Hall v. Mazzone,
 
 486 So.2d 408, 410 (Ala. 1986)
 

 “ ‘ “ ‘Appellate courts do not sit in judgment of disputed evidence that was presented
 
 ore terms
 
 before the trial
 
 court.Ex parte Roberts,
 
 796 So.2d 349, 351 (Ala.2001) (quoting
 
 Ex parte Bryowsky,
 
 676 So.2d 1322, 1324 (Ala. 1996)). “When the evidence in a case is in conflict, the trier of fact has to resolve the conflicts in the testimony, and it is not within the province of the appellate court to reweigh the testimony and substitute its own judgment for that of the trier of fact.”
 
 Delbridge v. Civil Serv. Bd. of Tuscaloosa,
 
 481 So.2d 911, 913 (Ala.Civ.App.1985). “[A]n appellate court may not substitute its judgment for that of the trial court. To do so would be to reweigh the evidence, which Alabama law does not allow.”
 
 Ex parte Foley,
 
 864 So.2d 1094, 1099 (Ala.2003) (citations omitted).’ ”
 

 Friedman v. Friedman,
 
 971 So.2d 23, 28 (Ala.2007) (quoting
 
 Ex parte R.E.C.,
 
 899 So.2d 272, 279 (Ala.2004)). Our standard of review requires that we accord the circuit court’s judgment on the fraud counterclaim and all implicit findings necessary to support it a presumption of correctness. Accordingly, we affirm that part of the circuit court’s judgment in favor of the owners on their fraud counterclaim.
 

 IV.
 
 Whether the Compensatory-Damages Award Was Excessive
 

 The builders contend that the circuit court’s $57,200.17 compensatory-damages award was excessive because, they say, the owners proved, at most, damages of only $20,094.65 — the total of an itemized list admitted as owners’ exhibit 91. The owners insist that the circuit court was not limited to the sum shown on the itemized list but was authorized to consider all the evidence, including the owners’ testimony regarding mental anguish.
 

 At the close of the evidence, the circuit court asked the parties to brief the following issue: whether compensatory damages for mental anguish are available in a breach-of-contract action for building a house that is not a party’s primary residence. The record contains a letter brief to the circuit court from the owners but no response from the builders. On appeal, the builders do not argue that mental-anguish damages are never available for the breach of a contract to construct a house that is not a party’s primary residence. Instead, they maintain that the owners neither specially pleaded nor adequately proved that they had suffered any damages as a consequence of mental anguish.
 

 
 *566
 
 The builders’ special-pleading argument is answered by 1 Champ Lyons, Jr., and Ally W. Howell,
 
 Alabama Rules of Civil Procedure Annotated
 
 § 9.9 at 247-48 (4th ed.2004):
 

 “While damages for mental anguish are not generally recoverable in an action for breach of contract, in those instances where an exception allows the recovery of such damages, they are considered general damages. The requirement of Ala. R. Civ. P. Rule 9(g) for specifically stating ‘items of special damage’ does not apply to claims for damages for mental anguish in an action for breach of contract.
 
 Walker Builders, Inc. v. Lylcens, 628
 
 So.2d 923[,
 
 924]
 
 (Ala. Civ.App.1993).”
 

 With respect to the builders’ failure-of-proof argument, we note that Sharon Panetta testified that the house “cost a lot of money”; that in order to establish an $815,000 line of credit for the construction of the house, her husband had borrowed against his stock in United Parcel Service, a company for which he had worked his entire life; that she was “very upset” about the difficulties they had encountered in the construction of the house; and that she was even more upset because she and her husband had had a “special purpose” for building the house, which she described as follows:
 

 “Mike had a twin brother [who] died [in] March of 2002, and he promised his brother he would help take care of his boys. So we kind of made his boys part of our family, and we thought if we could have a place where we could all go together and have a good time and get to really know each other and spend time ... it would really be great, and ... Michael thought a lake house would be a place that everybody could have fun, and ... if not for that we probably would have never, never done this.”
 

 With respect to mental anguish, Michael Panetta testified:
 

 [T]his was an important thing. This was going to be more — I’ve lived in several homes, and I knew I was going to probably not live in them my whole life. My company has moved me several times. This home was going to be a home, not just for my family, but for my extended family for generations to come. And my wife and I went through the worst experience, and I can’t explain it to you how hard we tried to work in a collaborative way with Chuck and Katie Baldwin. We fought — I consider myself probably more disciplined or tactful — I don’t know how to describe it — and my wife is probably just a better judge of character than me. So we fought a lot. We’ve had tremendous pressure, just the cost of doing this. I’ve got six children. I’m proud to say I’ve got three through college, and I’ve got the other three in college, and they’ve all done well. I’ve got my own job and the demands and responsibilities that came with this. So I know it can maybe be called pain and suffering, and I feel like we’re entitled for all the pain and suffering that we went through.”
 

 Based on other evidence in the record, including the parties’ e-mails, it is evident that Michael Panetta’s testimony that “[w]e fought.... we fought a lot” refers to disagreements between the owners as to the best way to address problems with the builders; Sharon Panetta’s approach was direct and forceful, whereas Michael Pan-etta’s manner was more conciliatory and tactful. Notably, the owners did not testify that they had suffered any mental distress as a consequence of learning, after this litigation was underway, that the builders had engaged in allegedly fraudulent acts with respect to billing or convert
 
 *567
 
 ing construction-project funds to their personal use.
 

 In
 
 Ruiz de Molina v. Merritt & Furman Insurance Agency, Inc.,
 
 207 F.3d 1351 (11th Cir.2000), the United States Court of Appeals for the Eleventh Circuit accurately summarized Alabama law concerning the recovery of mental-anguish damages for breach of a contract to build a residence:
 

 “Under Alabama law, ‘[d]amages for mental anguish can be recovered ... where the contractual duty or obligation is so coupled with matters of mental concern or solicitude, or with the feelings of the party to whom the duty is owed, that a breach of that duty will necessarily or reasonably result in mental anguish or suffering.’
 
 Liberty Homes, Inc. v. Epperson,
 
 581 So.2d 449, 454 (Ala.1991) (quoting
 
 F. Becker Asphaltum Roofing Co. v. Murphy,
 
 224 Ala. 655, 141 So. 630, 631 (1932)). ... “.... The majority of the cases in which a plaintiff has been allowed to recover damages for mental anguish involved actions on ‘contracts for the repair or construction of a house or dwelling or the delivery of utilities thereto, where the breach affected habitability.’
 
 See, e.g., Epperson,
 
 581 So.2d at 454;
 
 Orkin Exterminating Co. v. Donaran,
 
 519 So.2d 1330 (Ala.1988);
 
 Lawler Mobile Homes, Inc. v. Tarver,
 
 492 So.2d 297 (Ala.1986);
 
 Alabama Power Co. v. Harmon,
 
 483 So.2d 386 (Ala.1986). Because a person’s home is said to be his ‘castle’ and the ‘largest single individual investment the average American family will make,’ these contracts are ‘so coupled with matters of mental concern or solicitude or with the feelings of the party to whom the duty is owed, that a breach of that duty will necessarily or reasonably result in mental anguish or suffering.’
 
 B & M Homes, Inc. v. Hogan,
 
 376 So.2d 667, 671-72 (Ala.1979). Where such a contractual duty [is] breached, the Alabama Supreme Court has said that ‘it is just that damages therefor be taken into consideration and awarded.’
 
 Id.
 
 at 671.
 

 [[Image here]]
 

 “The Alabama Supreme Court has made very clear, however, that all these cases represent an exception to the general rule prohibiting mental anguish damages for breach of contract. These cases deserve special treatment because it is highly foreseeable that egregious breaches of certain contracts — involving one’s home ..., for example — will result in significant emotional distress.
 
 See Sexton v. St. Clair Federal Sav. Bank,
 
 653 So.2d 959, 962 (Ala.1995).”
 

 Ruiz de Molina,
 
 207 F.3d at 1359-60.
 
 See also Hardesty v. CPRM Corp.,
 
 391 F.Supp.2d 1067, 1074 (M.D.Ala.2005) (citing
 
 Volkswagen of America, Inc. v. Dillard,
 
 579 So.2d 1301, 1304 (Ala.1991), for the proposition that “[t]he Alabama Supreme Court has indicated that it is not eager to “widen the breach in the general rule [prohibiting such damages]’ ”). We find it unnecessary to decide the question the circuit court put to the parties in this case — whether compensatory damages for mental anguish are available in a breach-of-contract action for building a house that is not a party’s primary residence — because we hold that, even
 
 if
 
 the lake house had been the owners’ primary residence, they would not have established their right to mental-anguish damages.
 

 The Eleventh Circuit Court of Appeals’ summary of Alabama law indicates that our decisions have set out three elements that are essential to the right to recover mental-anguish damages for the breach of a home-construction contract, namely: (1) that the breach be egregious, i.e., that it result in
 
 severe
 
 construction
 
 *568
 
 defects; (2) that those defects render the home virtually uninhabitable; and (3) that the breach
 
 necessarily or reasonably
 
 result in mental anguish or suffering.
 
 See, e.g., Liberty Homes, Inc. v. Epperson,
 
 581 So.2d 449, 454 (Ala.1991)(wiring defects that presented an imminent fire hazard);
 
 B & M Homes, Inc. v. Hogan,
 
 376 So.2d 667 (Ala.1979) (crack in the concrete slab extending from the front porch through the den that widened and extended throughout the house, causing severe damage);
 
 Hill v. Sereneck,
 
 355 So.2d 1129, 1132 (Ala.Civ.App.1978) (crack in the concrete slab that warped the doors and made them unable to be closed and locked, causing the owner’s stay-at-home wife to be “afraid and apprehensive” about her safety);
 
 F. Becker Asphaltum Roofing Co. v. Murphy,
 
 224 Ala. 655, 141 So. 630 (1932) (roof that, each time it rained, leaked into every room of the house, including the bedroom where the plaintiff slept).
 

 In the present case, most of the construction defects about which the owners complained were aesthetic — the paint color of the front door, the color of the stain on the natural-wood surfaces, the crack in the granite countertop, and whether a view of the lake would be obstructed by placing a wall near the stairs. None of the defects was severe enough to render the house uninhabitable. Moreover, the owners’ testimony indicates that the emotional distress they suffered during the progress of the construction was traceable
 
 either
 
 to their disagreement with each other about how to deal with the frustration of unmet expectations
 
 or
 
 to noncatastrophic, financial pressures. The owners’ testimony did not indicate that they were distressed about the structural integrity of the house, the safety and security of the dwelling, where they would reside while repairs were made, or the possibility of financial ruin.
 
 Compare Horton Homes, Inc. v. Brooks,
 
 832 So.2d 44, 54 (Ala.2001) (affirming an award of mental-anguish damages when homeowner’s wife testified that her husband “ ‘was a nervous wreck’ and ‘stayed stressed out’ and ‘[got] edgy about stuff.’ She stated that [her husband] would get up at 2:00, 3:00, or 4:00 in the morning and just sit on the couch and that when she would get up and ask him what was wrong he would tell her that ‘he didn’t know what [they] were going to do’ because ‘[they had worked] very hard for what little bit [they did] have and he just didn’t know ... if [they were] going to have to end up fixing [them defective manufactured home] [themselves] or what’ ”);
 
 F. Becker Asphaltum Roofing Co. v. Murphy,
 
 224 Ala. at 657, 141 So. at 631-32 (stating that “[t]he contract related to placing a roof on the plaintiffs residence, ... the habitation which she had provided to protect her against the elements, and to shelter her belongings that she thought essential to her comfort and well-being, the very things against which she made the contract to protect herself and her property, and as a result of the breach of the obligation which defendants assumed, the roof leaked to such extent that she was disturbed in her comfort, her household belongings were soaked with water, [and] her house was made damp”).
 
 See also Restatement of the Law of Contracts
 
 § 341 (1932) (stating that “damages will not be given as compensation for mental suffering, except where the breach ... was the wanton or reckless breach of a contract to render a performance of such a character that the defendant had reason to know when the contract was made that the breach would cause
 
 mental suffering for reasons other than mere pecuniary loss
 
 ” (emphasis added)). In short, we do not believe that the owners presented sufficient evidence of compensable mental anguish.
 

 
 *569
 

 Conclusion
 

 We affirm that part of the circuit court’s judgment denying the builders’ breach-of-contraet claim and determining the builders’ liability on the owners’ breach-of-contract and fraud counterclaims. However, because there was no basis to support the circuit court’s award of damages for mental anguish in this case, we reverse the circuit court’s judgment as it relates to the award of damages and remand the cause with instructions that the court deduct from its award any amounts that it awarded as damages for mental anguish.
 
 See Morris Concrete, Inc. v. Warrick,
 
 868 So.2d 429 (Ala.Civ.App.2003).
 

 AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
 

 THOMPSON, P.J., and PITTMAN, BRYAN, and MOORE, JJ., concur.
 

 [1]
 

 . Although the circuit court did not explicitly adjudicate the owners’ negligence, breach-of-fiduciary-duty, and money-paid-not-owed counterclaims, or issue a Rule 54(b), Ala. R. Civ. P., certification, we conclude that the judgment is final. The owners' negligence, breach-of-fiduciary-duty, and money-paid-not-owed counterclaims stated legal theories of recovery different from their breach-of-contract counterclaim, but all those counterclaims arose out of the same acts, were proved by the same evidence, and constituted, in effect, the same claim for relief, for which the owners were entitled to recover only once.
 
 See State v. Brantley Land, L.L.C.,
 
 976 So.2d 996 (Ala.2007):
 

 " '[W]hen a claimant presents a number of legal theories, but will be permitted to recover only on one of them, the bases for recovery are mutually exclusive, or simply presented in the alternative, and [the claimant] has only a single claim for relief for purposes of Rule 54(b).’ "
 

 976 So.2d at 999 n. 4 (quoting
 
 Scrushy v. Tucker,
 
 955 So.2d 988, 998 (Ala.2006), quoting in turn 10 Charles Alan Wright et al.,
 
 Federal Practice & Procedure
 
 § 2657 (3d ed. 1998)).
 

 [2]
 

 . On April 4, 2008, the circuit court entered an order acknowledging that it had mistakenly entered the March 28, 2007, order and vacating that order pursuant to Rule 60(a), Ala. R. Civ. P.