THOMPSON, Presiding Judge.
TLIG Maintenance Services, Inc. (“TLIG”), Gala P. Rusich, and Bruce Kit-chura (hereinafter referred to collectively as “the defendants”) appeal from a judgment entered on a jury verdict in favor of Deann Fialkowski on her claims against TLIG alleging breach of the implied warranty of good workmanship and breach of contract. Based on the jury’s verdict, a judgment was entered against TLIG for $27,176 in compensatory damages and $15,000 for mental anguish. Following the jury trial, a separate bench hearing was held after which the trial court entered a final judgment determining that TLIG’s corporate veil was due to be pierced and assessing the jury’s verdict against Rusich and Kitchura individually.[1] The defendants filed a timely postjudgment motion, which the trial court denied. They then appealed to the Alabama Supreme Court, which transferred the appeal to this court pursuant to § 12-2-7(6), Ala.Code 1975.[2]
On appeal, the defendants do not challenge the award of compensatory damages. They do, however, argue that the evidence presented at trial was insufficient to support an award of damages to Fial-kowski for mental anguish arising from the breach of contract and the breach of the implied warranty of good workmanship. They also argue that the trial court erred in denying their motion for a judgment as a matter of law as to this issue at the conclusion of the evidence presented during Fialkowski’s case-in-chief and in denying their renewed motion for a judgment as a matter of law as to this issue at the close of all the evidence in the jury trial.
“ ‘In reviewing a jury verdict, an appellate court must consider the evidence in the light most favorable to the prevailing party....’ Delchamps, Inc. v. Bryant, 738 So.2d 824, 831 (Ala.1999). See also Cobb v. MacMillan Bloedel, Inc., 604 So.2d 344 (Ala.1992), and Mason & Dixon Lines, Inc. v. Byrd, 601 So.2d 68 (Ala.1992). A presumption of correctness attaches to a jury verdict, ‘if the verdict passes the “sufficiency test” presented by motions for directed verdict and a JNOV [i.e., judgment notwithstanding the verdict].’ S & W Properties, Inc. v. American Motorists Ins. Co., 668 So.2d 529, 534 (Ala.1995). (Rule 50(a), Ala. R. Civ. P., now designates a motion for a directed verdict as a motion for a judgment as a matter of *1274 law, and Rule 50(b) now designates a motion for JNOV as a renewed motion for a judgment as a matter of law.) This presumption is strengthened by a trial court’s denial of a motion for a new trial. Christiansen v. Hall, 567 So.2d 1338 (Ala.1990). ‘This Court will not, on a sufficiency of the evidence basis, reverse a judgment based on a jury verdict unless the evidence, when viewed in a light most favorable to the [verdict winner], shows that the verdict was “plainly and palpably wrong and unjust.”,’ S & W Properties, 668 So.2d at 534 (quoting Christiansen, 567 So.2d at 1341). ‘Whether to grant or deny a motion for, new trial rests within the sound discretion of the trial court, and , this. .Court will not reverse a ruling in ¡.that regard unless it finds that the trial court’s ruling constituted an abuse of that discretion.’ Colbert County-Northwest Alabama Healthcare Authority v. Nix, 678 So.2d 719, 722 (Ala.1995). ‘Without a. showing of such an abuse, the trial court’s ruling must be affirmed.’ Id.” ■
Liberty Nat’l Life Ins. Co. v. Sanders, 792 So.2d 1069, 1072 (Ala.2000).
“ ‘A judgment as a matter of law is proper only where there is a complete absence of proof on a material issue or where there are no controverted ques-of fact on which reasonable people could differ and the moving party is entitled to a judgment as a matter of Locklear Dodge City, Inc. v. Kimbrell, 703 So.2d 303, 304 (Ala.1997) (internal quotations and alterations omitted). In reviewing the denial of a motion for a judgment as a matter of law, this Court must view all evidence in the light most favorable to the non-moving party. See Bussey v. John Deere Co., 531 So.2d 860, 863 (Ala.1988).”
Southern Energy Homes, Inc. v. Washington, 774 So.2d 505, 510-11 (Ala.2000).
The evidence adduced at trial tends to demonstrate the following facts relevant to the issue of the propriety of an award of damages for mental anguish. Fialkowski purchased her house in Huntsville in May 2007. She testified that the outside of the house “was looking pretty rough” and that there was construction work and repairs she wanted done on the house, including the replacement of exterior siding and two decks, repairs to a leaking chimney, and the addition of a screened-in porch to the back of the house. She said that she estimated the cost of the projects to be about $35,000, and she saved money for several years to pay for them. After three years,' she said, she had saved $20,000.
Fialkowski worked as a nurse at a local hospital. During a discussion about the work she wanted to have done on the house, Fialkowski said, one of her coworkers, Rusich, who is also a nurse, told her that she and her boyfriend, Kitchura, “had a company” and that Kitchura was a contractor. When Fialkowski believed she had saved a sufficient amount of money to begin the projects, she said, she told Ru-sich she would like to talk with Kitchura.
After meeting and discussing her plans, Fialkowski said, she and Kitchura entered into a contract on March 14, 2013, for numerous repairs to the house, including the installation of new shutters, doors, and exterior siding, as well as the construction of an upper and lower deck or porch. The upper deck was to be enclosed underneath to create a dry storage room. The lower deck was to be screened in, with a “lean-to” roof.
On April 4, 2013, Kitchura accompanied Fialkowski to complete the application for the building permit required for the project. Kitchura testified that he filled out the application, which indicated that the *1275 job was to consist of only repair work and that the total cost of the “alterations or additions” was to be $5,300. Kitchura acknowledged that TLIG’s business license permitted him to paint, wallpaper, and do drywall and Sheetrock work and that the work Fialkowski wanted completed was beyond the scope of TLIG’s business license. He also admitted that neither he nor TLIG was permitted to enter into a contract for more than $10,000 because he did not have a homebuilder’s license. Based on the information provided on the application, however, the building permit was issued on April 11, 2013.
Work on Fialkowski’s house began in April 2013 and proceeded over a period of many months, including times when no work was being done on the house at all. Fialkowski testified that, as construction progressed, she had concerns about how stable the structure was and about the amount of head space there would.be once the roof was placed on the porch. She said that, when she expressed her concerns to Kitchura, he assured her that everything would be fine. She also had to remind Kitchura that the porch was to be screened in. Fialkowski said that, because of her concerns, she contacted the building inspector’s office for the City of Huntsville.
On December 27, 2013, Claire Davies, a building inspector with the City of Huntsville, went to Fialkowski’s house to assess the work in progress. Davies testified that she saw that concrete slabs had been poured and learned that decks that, according to the building permit, were only to be repaired were actually being replaced. Davies said that she noticed the deck under construction had tall posts, so she asked Fialkowski about what was being built. Fialkowski told Davies that the. lower deck was to be a screened-in porch attached to the house and that the upper deck was to be a “story-up deck.” That work exceeded the scope of the building permit, Davies said.
Davies testified that her inspection showed that the work that had been done on the deck up to that point failed to comply with the International Residential Building Code (“the building code”). Davies said that the building code sets forth minimum standards required for the construction of one- and two-family residences and that it governs structures, including framing and footings, but does not include electrical or mechanical standards. Because the screened-in porch was to have a roof, it was considered part of the structure, Davies said.
Davies said that, during her inspection, she noted that soil had been brought to the construction site. She explained that engineers needed to ensure that the soil where the structure was being built could support the load, that the soil had to meet certain compaction rates, and that the footings of the structure had to be a certain depth. The purpose of such requirements, Davies said, was to ensure that the house would remain stable as the ground changed and moved with moisture. Davies said that there was no footing at all under the concrete slab poured for what was to be the screened-in porch and that, therefore, the construction failed to meet the building code. The framing for the porch was not complete at that point, Davies said, but, she stated, the girders used to support the floor joists underneath the porch did not meet building-code requirements. Davies also noted other building-code violations regarding the way the steps and handrail had been constructed. ' Davies said that she suggested ways that the proper footings and girders could be added so that the structure could be brought into compliance with the building code without the need to remove what had already been built.
*1276 Fialkowski said that, after Davies inspected the construction, she contacted Kitchura. He told Fialkowski that he needed more money to complete the work. Fialkowski said that she questioned Kit-chura about how her payments to him thus far had been used and that he could not satisfactorily account for how that money had been spent. She also told Kitchura she was unhappy with the way the construction was proceeding. At the end of their conversation, Fialkowski said, she told Kitchura she could not “continue the build the way it is.” Kitchura told her he was going to leave and would come back later for his tools.
Fialkowski said that she felt like she “was stuck between a rock and a hard place” because she had spent all the money she had saved for the project and all the proceeds from the loan she had taken out to pay for the project in full. She said that she was forced into wondering how she could continue to pay her bills and complete the project, adding: “If I couldn’t keep my house, I couldn’t sell it either.” Fialkowski said that she believed she had no choice but to go forward, so she “sold” one of her retirement plans to have money to rebuild, and, in April 2014, she hired someone else to complete the building project. She also testified that she had been worried and unable to sleep, so she would “go through the house” at night to find things to sell on an Internet auction site to raise money. Fialkowski testified that it cost $8,076 to demolish the work Kitchura had done and that, to complete the porch and deck project, she paid $15,171.69 in addition to the total she had paid TLIG for the work Kitchura had done.
In Alabama, the general rule is that damages for mental anguish are not recoverable as part of a claim alleging breach of contract. B & M Homes, Inc. v. Hogan, 376 So.2d 667, 671 (Ala.1979). One of the exceptions to that general rule, however, allows damages to be awarded for mental anguish when the action involves a contract for construction or repairs to a person’s residence and the breach of the contract “ ‘actually caused the complaining party mental anguish or suffering and ... was such that it would necessarily result in emotional or mental detriment to the plaintiff....’ ” Id. at 672 (quoting Hill v. Sereneck, 355 So.2d 1129, 1132 (Ala.Civ.App.1978)).
In Baldwin v. Panetta, 4 So.3d 555 (Ala.Civ.App.2008), this court included a survey of the circumstances under which damages for mental anguish have been permitted in connection with the construction or repair of a residence. This court stated:
“In Ruiz de Molina v. Merritt & Furman Insurance Agency, Inc., 207 F.3d 1351 (11th Cir.2000), the United States Court of Appeals for the Eleventh Circuit accurately summarized Alabama law concerning the recovery of mental-anguish damages for breach of a contract to build a residence:
“ ‘Under Alabama law, “[d]amages for mental anguish can be recovered ... where the contractual duty or obligation is so coupled with matters of mental concern or solicitude, or with the feelings of the party to whom the duty is owed, that a breach of that duty will necessarily or reasonably result in mental anguish or suffering.” Liberty Homes, Inc. v. Epperson, 581 So.2d 449, 454 (Ala.1991) (quoting F. Becker Asphaltum Roofing Co. v. Murphy, 224 Ala. 655, 141 So. 630, 631 (1932))....
“ ‘.... The majority of the cases in which a plaintiff has been allowed to recover damages for mental anguish involved actions on “contracts for the repair or construction of a house or *1277 dwelling or the delivery of utilities thereto, where the breach affected habitability.” See, e.g., Epperson, 581 So.2d at 454; Orkin Exterminating Co. v. Domaran, 519 So.2d 1330 (Ala.1988); Lawler Mobile Homes, Inc. v. Tarver, 492 So.2d 297 (Ala.1986); Alabama Power Co. v. Harmon, 483 So.2d 386 (Ala.1986). Because a person’s home is said to be his “castle” and the “largest single individual investment the average American family will make,” these contracts are “so coupled with matters of mental concern or solicitude or with the feelings of the party to whom the duty is owed, that a breach of that duty will necessarily or reasonably result in mental anguish or suffering.” B & M Homes, Inc. v. Hogan, 376 So.2d 667, 671-72 (Ala.1979). Where such a contractual duty [is] breached, the Alabama Supreme Court has said that “it is just that damages therefor be taken into consideration and awarded.” Id. at 671.
[[Image here]]
“ ‘The Alabama Supreme Court has made very clear, however, that all these eases represent an exception to the general rule prohibiting mental anguish damages for breach of contract. These cases deserve special treatment because it is highly foreseeable that egregious breaches of certain contracts—involving one’s home ..., for example—will result in significant emotional distress. See Sexton v. St. Clair Federal Sav. Bank, 653 So.2d 959, 962 (Ala.1995).’
“Ruiz de Molina, 207 F.3d at 1359-60. See also Hardesty v. CPRM Corp., 391 F.Supp.2d 1067, 1074 (M.D.Ala.2005) (citing Volkswagen of America, Inc. v. Dillard, 579 So.2d 1301, 1304 (Ala.1991), for the proposition that ‘[t]he Alabama Supreme Court has indicated that it is not eager to “widen the breach in the general rule [prohibiting such damages]” ’)....
“The Eleventh Circuit Court of Appeals’ summary of Alabama law indicates that our decisions have set out three elements that are essential to the right to recover mental-anguish damages for the breach of a home-construction contract, namely: (1) that the breach be egregious, i.e., that it result in severe construction defects; (2) that those defects render the home virtually uninhabitable; and (3) that the breach necessarily or reasonably result in mental anguish or suffering. See, e.g., Liberty Homes, Inc. v. Epperson, 581 So.2d 449, 454 (Ala.l991)(wiring defects that presented an imminent fire hazard); B & M Homes, Inc. v. Hogan, 376 So.2d 667 (Ala.1979) (crack in the concrete slab extending from the front porch through the den that widened and extended throughout the house, causing severe damage); Hill v. Sereneck, 355 So.2d 1129, 1132 (Ala.Civ.App.1978) (crack in the concrete slab that warped the doors and made them unable to be closed and locked, causing the owner’s stay-at-home wife to be ‘afraid and apprehensive’ about her safety); F. Becker Asphaltum Roofing Co. v. Murphy, 224 Ala. 655, 141 So. 630 (1932) (roof that, each time it rained, leaked into every room of the house, including the bedroom where the plaintiff slept).”
Baldwin, 4 So.3d at 567-68.
In considering the severity of the defects involved in home-construction cases in which damages awards for mental anguish had been upheld, the Baldwin court determined that, because “[n]one of the defects [complained of] was severe enough to render the house uninhabitable,” the *1278 homeowners in that case were not entitled to recover damages for mental anguish. Id. at 568. This court noted that the safety and integrity of the house was not an issue for the homeowners, the homeowners were not facing “the possibility of financial ruin,” and the homeowners were not left without a place to live while repairs were made. Id.
In Volkswagen of America, Inc. v. Dillard, 579 So.2d 1301, 1306 (Ala.1991), our supreme court accepted the following definition of “mental anguish” from Black’s Law Dictionary (6th ed.1990):
“ ‘.,. As an element of damages [mental anguish] implies a relatively high degree of mental pain and distress; it is more than mere disappointment, anger, worry, resentment, or embarrassment, although it may include all of these, and it includes mental sensation of pain resulting from such painful emotions as grief, severe disappointment, indignation, wounded pride, shame, despair and/or public humiliation. In other connections, and as a ground for divorce or for compensable damages or an element of damages, it includes the mental suffering resulting from the excitation of the more poignant and painful emotions, . such as grief, severe disappointment, indignation, wounded pride, shame, public humiliation, despair, etc.’ ”
Fialkowski testified that, as a result of having to pay the added expense of removing the work done by Kitchura and then completing the project, she had been “worried” and had been unable to sleep. However, a review of the record reveals no evidence- from which the jury could have determined that, as a result of Kitchura’s poor construction work or TLIG’s failure to complete the terms of the contract, Fial-kowski suffered severe disappointment or distress rising to the level required to warrant an award of damages for mental anguish.
Furthermore, although there is no question that Kitchura’s work on the upper deck and screened-in porch was substandard, there is no evidence in the record to suggest that the substandard work rendered Fialkowski’s house uninhabitable or, in fact, caused any damage to the house itseilf. There is also no evidence demonstrating that Fialkowski’s health or safety was endangered in any way by remaining in the house or that any of her possessions were exposed to harm. Although Fialkow-ski unquestionably incurred additional expenses in having to remove the unacceptable work Kitchura had done and that she worried about how to pay for that added expense, there is no' evidence that those expenses were financially devastating to Fialkowski.
Although we sympathize with Fial-kowski on the frustration, worry, and added expense that she experienced in this case, we cannot say that they exceed the frustration, worry, and added expense in any given breach-of-contract case in which damages for mental anguish are not recoverable. The rationale for allowing the recovery of mental-anguish damages in a contract case involving the construction or repair of a house is that it is foreseeable that an individual who is left with a house that is rendered uninhabitable by defective construction or repairs “would undergo extreme mental anguish.” B & M Homes, 376 So.2d at 672. The same cannot be said for the addition of a deck or porch to an existing home. Under the facts of this case, we decline to expand the exception allowing recovery of damages for mental anguish in contract cases alleging severe defects in the construction of or repairs to a home to include the construction of decks or porches added to an existing home. For these reasons, we conclude that the *1279 defendants were entitled to a judgment as a matter of law regarding the issue of mental anguish. Therefore, the trial court erred in denying the defendants’ motion for a judgment as a matter of law as to this issue, and the judgment entered on the jury’s verdict awarding Fialkowski $15,000 in damages for mental anguish is reversed.
Rusich and Kitchura also argue that the- trial court erred in disregarding the corporate existence of TLIG and holding them personally liable for the damages awarded to Fialkowski under a theory of piercing the corporate veil.
“Whether the corporate veil of a business entity should be pierced is a matter of equity, properly decided by a judge after a jury has resolved the accompanying legal issues. Stephens v. Fines Recycling, Inc., 84 So.3d 867, 877 (Ala. 2011); Ex parte Thorn, 788 So.2d 140 (Ala.2000). We accordingly review a trial court’s determination in this regard under the ore tenus standard of review, which dictates that the trial court’s judgment based on ore tenus evidence ‘“is presumed correct and should be reversed only if the judgment is found to be plainly and palpably wrong, after consideration of all the evidence and after drawing all inferences that can logically be drawn from that evidence.” ’ Thomas v. Neal, 600 So.2d 1000, 1001 (Ala.1992) (quoting Sundance Marina, Inc. v. Reach, 567 So.2d 1322, 1324-25 (Ala.1990)).”
Heisz v. Galt Indus., Inc., 93 So.3d 918, 929 (Ala.2012).
In its judgment piercing the corporate veil, the trial court stated that it considered evidence adduced at both the trial and at the subsequent hearing devoted solely to this issue. The evidence relevant to the issue of whether the trial court properly pierced the corporate veil indicated the following. .
As mentioned, Rusich worked as a nurse at a hospital in Huntsville. In 2010, Kit-chura, whom Rusich had known for more than 30 years, moved from New Orleans'to Huntsville and began living with her: Ru-sich testified that Kitchura had been in the construction business before moving to Huntsville. In an effort to obtain a job, Rusich,said, Kitchura approached real-estate agents, but, she said,- they required Kitchura to be licensed before he could do work for them. Rusich said that she believed Kitchura had to -have a company to obtain a license, so, she said, she “ended up with a gentleman” who helped her form a corporation, TLIG, through-which Kit-chura could conduct business.
Rusich testified that she 'was the only shareholder in the corporation. .Kitchura testified that he never had .an ownership interest in TLIG, that he never owned stock in the corporation, .and that.he was never an officer or director -of the corporation. Rusich then obtained a business license for TLIG. She. testified that -it was her understanding that, with the license, Kitchura could do anything required for residential construction with the exception of putting roofs on houses. Rusich said that she opened a corporate bank account using $100 of her own money, and had business cards printed. She testified that she also later deposited money with which to pay TLIG’s insurance. Rusich ..stated that Kitchura had the title of “superintendent.” She said that he did not receive,a salary from TLIG but that he had. her authorization to withdraw any money he needed from the corporate account for work expenses and for personal expenses, without limitation. Rusich testified that TLIG had no employees.
Kitchura testified that, after Fialkow-ski’s payments were deposited in the .cor *1280 porate account, he could use that money for personal expenses. The only limitations on his use of the money, Kitchura said, were “common sense things” like gambling or going to strip clubs, “things that would just be outrageously stupid.” Rusich said that she did not monitor Kit-chura’s spending and that she made no effort to ensure that sufficient amounts of the money Fialkowski paid to TLIG for her building project were held in reserve to pay for the expenses TLIG incurred to complete the project. Rusich testified that she and Kitchura also had an agreement pursuant to which they would split TLIG’s profits “60/40.” The record is unclear as to who would receive which portion of the profits. They did not have an agreement as to the allocation of loss.
TLIG had had only one previous client before beginning the project for Fialkow-ski. Rusich testified that TLIG had sustained a loss on that project. The evidence indicated that the corporate account did not contain any money when Fialkow-ski agreed to use TLIG for the construction work she wanted completed.
Fialkowski presented evidence indicating that both Rusich and Kitchura made numerous personal purchases from the corporate account, including purchases from a jewelry store, a Gander Mountain sporting-goods store, a Dillard’s department store, a TJ Maxx department store, and Stauer’s, a shop specializing in sunglasses and watches. Additional evidence showed that money from the corporate account was used to pay for service performed on Rusich’s personally owned Mercedes, new tires for the Mercedes, personal medical prescriptions for Rusich, haircuts, groceries, and food and beverages at bars and restaurants in Huntsville, including a meal at a steakhouse for Kitchura, Rusich, and Rusich’s mother “just to be nice.” A bank statement indicates that $200 from the corporate account was used to purchase a pair of sunglasses. Expenses incurred during trips to the Jack Daniel’s Distillery and to visit Kitchura’s family in Pennsylvania were paid for from the corporate account, as were expenses incurred at a veterinarian’s clinic. Bank records indicate that at least $8,000 worth of cash withdrawals were made from the corporate account while the Fialkowski project was in progress, but TLIG had no receipts or other documentation to demonstrate how that money was spent.
Kitchura testified that he determined that he could do the Fialkowski project for $82,000, which would include approximately $4,500 of profit for TLIG. However, he said, he did not limit his personal spending from the corporate account to $4,500. The evidence presented indicated that almost $17,500 of the approximately $88,000 Fial-kowski had paid to TLIG for completion of the building project either would not have been spent or would have come out of Rusich’s own pocket to pay for Kitchura’s purchases had Kitchura not been authorized to withdraw money from the corporate account without limitation.
“The Alabama Supreme Court has set out the following extraordinary circumstances in which it would be appropriate to pierce the corporate veil: 1) where the corporation is inadequately capitalized; 2) where the corporation is conceived or operated for a fraudulent purpose; or 3) where the corporation is operated as an instrumentality or alter ego of an individual or entity with corporate control. First Health, Inc. v. Blanton, 585 So.2d [1331] at 1334 [(Ala.1991)] (citing Messick v. Moring, 514 So.2d 892, 894 (Ala.1987)). See also M & M Wholesale Florist, Inc. v. Emmons, 600 So.2d 998 (Ala.1992).”
*1281 Gilbert v. James Russell Motors, Inc., 812 So.2d 1269, 1273 (Ala.Civ.App.2001)(em-phasis added).
In Alabama, “the court will disregard the corporate entity when it is used solely to avoid personal liability of the owner while reserving to the owner the benefits gained through use of the corporate name.” Woods v. Commercial Contractors, Inc., 384 So.2d 1076, 1079 (Ala.1980). Our supreme court has held:
“The corporate veil may be pierced where a corporation is set up as a subterfuge, where shareholders do not observe the corporate form, where the legal requirements of corporate law are not complied with, where the corporation maintains no corporate records, where the corporation maintains no corporate bank account, where the corporation has no employees, where corporate and personal funds are intermingled and corporate funds are used for personal purposes, or where an individual drains funds from the corporation.”
Simmons v. Clark Equip. Credit Corp., 554 So.2d 398, 401 (Ala.1989); see also Econ Marketing, Inc. v. Leisure American Resorts, Inc., 664 So.2d 869, 870 (Ala.1994). Furthermore, to pierce the corporate veil, a plaintiff must show fraud in asserting the corporate existence or must show that recognition of the corporate existence will result in injustice or inequitable consequences. Econ Marketing, 664 So.2d at 870; Washburn v. Rabun, 487 So.2d 1361, 1366 (Ala.1986).
In this case, the trial court found that it was appropriate to pierce the corporate veil on the grounds that TLIG was under-capitalized and that Rusich and Kitchura operated TLIG merely as an instrumentality or alter ego of Rusich. The undisputed evidence indicates that Rusich authorized Kitchura to use money from TLIG’s corporate account to pay for personal expenses for both Rusich and Kitchura. Moreover, Rusich acknowledged that, by allowing Kitchura to make cash withdrawals and pay for personal expenses from the corporate account, she did not have to provide him with money from her own account to pay for those expenses. Additionally, she did not require Kitchura to ensure that, after making his personal purchases with money from the corporate account, there was sufficient money remaining in that account to pay for the materials and labor to complete the Fialkowski project. There is substantial evidence to- indicate that TLIG funds and Rusich’s personal funds were intermingled, that TLIG funds were used for Kitchura’s and Rusich’s personal purposes, and that Kitchura used money from the TLIG corporate account for his benefit and for the benefit of Rusich. The evidence further indicates that TLIG failed to keep adequate financial records to account for its expenditures in connection with the Fialkowski project or to ensure that a sufficient amount of Fialkowski’s payments remained in the TLIG corporate account to pay for the expenses connected with that project.
From the evidence presented, the trial court reasonably could have found that, by allowing Kitchura to withdraw money from the TLIG corporate account for virtually any purpose, including to pay for personal expenses that Rusich otherwise would have had to pay out of her own pocket, Rusich disregarded the separate existence of the corporate form-for her benefit, that is, Rusich operated TLIG as an instrumentality or alter ego. To allow her to avoid liability for the compensatory damages owed to Fialkowski because of the existence of the corporation would result in an injustice and have inequitable consequences. Because we hold that the trial court’s determination that the corporate veil was due to be pierced on the ground *1282 that- Rusich operated TLIG as an alter ego, we pretermit discussion of the other grounds upon which the trial court could have, found to pierce the corporate veil, for examples that TLIG was undercapitalized. We -conclude that the trial court’s judgment piercing the corporate veil is due to be. affirmed as to Rusich.
Kitchura contends that, because he was not-- a shareholder in or officer óf TLIG, the: trial court could not properly pierce the- corporate veil to hold him liable for the darriáges TLIG had been ordered to pay to Fialkowski. In its judgment, the' trial court found that, because it had pierced the corporate veil, “there was no corporate existence behind” which Kitchura could be shielded from- paying damages.
“ ‘In Alabama, as elsewhere, it is basic that a corporation is a distinct and separate entity from the individuals who compose it as stockholders or who manage it' as directors or 'officers. Loper v. Gill, 282 Ala. 614, 213 So.2d 674 (1968).’” Hill v. Fairfield Nursing & Rehab. Ctr., LLC, 134 So.3d 396, 407 (Ala.2013)(quoting Cohen v. Williams, 294 Ala. 417, 420 318 So.2d 279, 281 (1975))(emphasis added).
“ ‘ “The doctrine that a corporation is a legal entity existing separate and apart from the persons composing it is a legal -theory introduced for purposes of convenience and to subserve the ends of justice. The concept cannot, -therefore, be extended to a point beyond its reason and policy, and when invoked in support of an end subversive of this policy, will be disregarded by the ¡courts. Thus, in an appropriate case -and in furtherance ■ of the ends of justice, a corporation and the individual or individuals omiing all its stock and assets mil be treated as identical.” ’
“Cohen v. Williams, 294 Ala. 417, 420, 318 So.2d 279, 280-81 (1975) (quoting 18 Am.Jur.2d Corporations § 14, p. 559).”
Id. Furthermore, “[a] court may ‘pierce the corporate veil’ and declare a stockholder or officer the corporation’s alter ego when evidence is present that the stockholder or officer used the corporate form to escape personal liability. Alorna Coat Corporation, Inc. v. Behr, 408 So.2d 496, 498 (Ala.1981).” McKissick v. Auto-Owners Ins. Co., 429 So.2d 1030, 1033 (Ala.l983)(emphasis added).
As the cited cases demonstrate, our supreme court has allowed the corporate veil to be pierced to hold liable a corporate entity’s shareholders, officers, and/or directors under certain circumstances. Research has revealed no Alabama authority in which our supreme court has expanded the doctrine of disregarding the corporate existence to reach one who is associated with a corporate entity, even in a managerial role, but who is not a shareholder, officer, or director of that corporate entity. After due deliberation of the issues associated with such an expansion, our supreme court may choose to broaden the application of the doctrine under certain circumstances; however, at this time, this court has chosen to follow established precedent, which limits possible liability under the doctrine to shareholders, officers, and/or directors of corporate entities.[3] Additionally, research has revealed no legal basis for the trial court’s determination that, because the corporate veil had been pierced, there was no corpo *1283 rate structure to shield Kitchura, a non-shareholder, from liability. The evidence indicates that Rusich was the sole shareholder of TLIG. In their appellate brief, which was submitted jointly, the defendants maintain that Rusich was the sole shareholder. The evidence is also undisputed that Kitchura was not an officer or director of TLIG. Because Kitchura was not a shareholder, officer, or director of TLIG, there was no legal basis, under Alabama law, for the trial court to hold Kitchura responsible for the debts or liabilities of TLIG, including the compensatory damages awarded to Fialkowski in this case.
For the reasons set forth above, the trial court’s judgment piercing the corporate veil and concluding that Rusich was individually and personally liable for the compensatory damages awarded to Fialkowski is due to be affirmed. However, we reverse the trial court’s determination that Kitchura was also individually liable for the award of compensatory damages TLIG was ordered to pay Fialkowski. We also reverse that portion of the judgment awarding Fialkowski damages for mental anguish. The cause is remanded for the trial court to enter a judgment consistent with this opinion. •
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
PITTMAN, THOMAS, and DONALDSON, JJ., concur,
MOORE, J., concurs in part and dissents in part, with writing.

. The jury returned a verdict in favor of each of the defendants on Fialkowski's claim alleging violation of the Alabama Deceptive Trade Practices Act, § 8-19-1 et seq., Ala.Code 1975.

. Before filing her appellate brief, Fialkowski had filed a motion to dismiss the appeal on the ground that the defendants’ notice of appeal was untimely and that Rusich and Kit-chura lacked standing to prosecute the appeal. This court denied the motion to dismiss on April 26, 2016. In her brief on appeal, which was filed on April 29, 2016, Fialkowski again asserts that the appeal was untimely. Specifically, in a one-paragraph argument, she contends that TLIG’s motion for a judgment as a matter of law, filed before the trial court entered its final judgment piercing the corporate veil, constituted the defendants’ first “postjudgment motion.” Therefore, she says, their subsequently filed motion to alter, amend, or vacate the final judgment was a successive postjudgment motion. The defendants’ motion to alter, amend, or vacate the judgment, filed after the final judgment was entered, was not a successive postjudgment motion, and it tolled the time in which the defendants had to appeal. The notice of appeal was filed within 42 days of the denial of the defendants’ postjudgment motion to alter, amend, or vacate the judgment. Therefore, it was timely.

, .We are also mindful that, in this case, the jury was given the option of returning a verdict against Kitchura in his individual capacity as to Fialkowski’s claim that he had ■ violated the Deceptive Trade Practices Act. Specifically, Fialkowski had alleged that Kit-chura had engaged in construction without the proper licenses and had constructed a substandard product. The jury found in favor of Kitchura as to that claim.